UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | |
|---|---|
| BERTHA M. LEWIS, ) | |
| ) | |
| Plaintiff, ) | |
| vs. ) | Cause No. 2:11-cv-313 |
| ) | |
| SAINT MARGARET MERCY, ) | |
| ) | |
| Defendant. ) | |

## OPINION AND ORDER

Plaintiff Bertha Lewis was discharged from her job as a housekeeper at St. Margaret Mercy Hospital[1] after an alleged act of insubordination involving a confrontation with a nurse. Lewis says the real reason she was fired was due to her age, in violation of the Age Discrimination in Employment Act. St. Margaret now seeks summary judgment [DE 51] on Lewis' claim. For the reasons explained below, the motion is **GRANTED**.

## Factual Background

Bertha Lewis began working as a housekeeper at St. Margaret in 1974, when she was eighteen years old. She continued in that position until August 2010, when she was terminated at the age of fifty-five. Lewis' current troubles at the hospital began in the Spring of 2009. Lewis' responsibility as a housekeeper was to clean floor 4E – the orthopedic surgical floor of the hospital. 4E consisted of nine patient rooms, common areas, and six joint camp rooms. [DE

---

[1] Defendant is properly known as Franciscan Alliance, Inc. d/b/a Franciscan St. Margaret Health, but was named in the operative complaint as St. Margaret Mercy. [DE 16.] For simplicity's sake, I will refer to Defendant throughout as St. Margaret.

1

51-1 at 8-9.] The joint camp rooms were fancier patient rooms for the hospital's wealthier patients and were rarely fully occupied. [DE 65-1 to DE 65-10.]

In the Spring of 2009, Lewis' supervisors told the housekeeping staff that everyone would have to take on additional work due to budget cutbacks and the absence of several employees on medical leave. [DE 51-1 at 21; DE 51-6 at 6-7.] As part this effort, Lewis was assigned to clean the outpatient services area. [DE 51-1 at 12; DE 51-8.] Lewis was unhappy with the assignment because she believed she had enough work to do cleaning 4E. [DE 51-1 at 15.] Outpatient services, also located on the fourth floor, consisted of some testing rooms, a few bathrooms, a locker room, reception room and a break room.

After she was assigned outpatient services, Lewis struggled to keep up and began to run into trouble with her supervisor, Gloria Wilcher. On April 3, 2009, Wilcher gave Lewis a written counseling, the first step in St. Margaret's progressive discipline policy, for failing to clean the outpatient services area. [DE 51-1 at 16-17, 62; DE 51-4 at 2.] Lewis received a second counseling, for the same reason, the following month. [DE 51-1 at 22-23, 64.]

After this second counseling, Lewis reached out to the hospital's Chief Operating Officer John Mentgen to complain about the increased workload. In response, Mentgen asked Wilcher's superiors – Marla Hoyer-Lareau and Susan Greenwald – to prepare a memo responding to Lewis' concerns. [DE 51-4 at 2; DE 51-6 at 3.] The memo compared Lewis' workload to the workload of a housekeeper on a floor of similar size and determined that Lewis had plenty of time to clean the outpatient services area. [DE 60.] Lewis objected to the memo because it didn't account for her responsibility for the joint camp rooms. So on June 24, 2009, Lewis, Hoyer-Lareau, Greenwald, and Wilcher met and reached a compromise whereby Lewis was

2

authorized to call Housekeeping for help anytime she had four or more patients in the joint camp rooms.  [DE 51-1 at 18-20; DE 58.]

The compromise did not seem to help because less than a month later, Lewis received a written warning for not cleaning patient beds on 4E.  [DE 51-1 at 65.]  And then, two months later, she received a second written warning for failing to clean the bed of a discharged patient.  [DE 51-1 at 66-67.]  A few weeks after that, Lewis again didn't complete her work, and this time she was suspended for three days without pay.  [DE 51-1 at 68.]  The suspension was ultimately upheld by a peer review panel.  [DE 51-1 at 54.]

On August 13, 2010, another incident occurred with Lewis which ultimately led to her termination.  Here's what happened: the charge nurse on duty that day, Tina Tuskan, asked Lewis to clean a bed for a new admission.  There were six patients in the joint camp rooms that day, so Lewis was entitled to ask the Housekeeping department for help cleaning patient beds pursuant to the earlier agreement that was reached in that regard.  Instead of asking for help, though, Lewis simply refused to clean the bed, telling Tuskan to call someone else if she wanted the bed cleaned.  [DE 51-1 at 45-47.]  Lewis left for vacation shortly afterwards, but when she returned on August 29, 2010, Susan Greenwald terminated her for insubordination.  [*Id.*; DE 51-8 at 2.]  Lewis appealed the termination, but it was upheld by Hoyer-Lareau, the peer-review panel, John Mentgen, and Hospital President Tom Gryzbek. [DE 51-1 at 47-57; DE 51-7 at 4-5.]

## Discussion

The ADEA provides that it is "unlawful for an employer . . . to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's age."  29 U.S.C. §

3

623(a)(1). St. Margaret now seeks summary judgment on this claim. Summary judgment is proper if "there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(a). A genuine dispute about a material fact exists only "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

To prevail on a discrimination claim under the ADEA, Lewis may proceed under either the direct or indirect method of proof. *Atanus v. Perry*, 520 F.3d 662, 671 (7th Cir. 2008). Under the direct method, a plaintiff must present direct and/or circumstantial evidence that "points directly to a discriminatory reason for the employer's actions." *Id.* Under the indirect method, a plaintiff must adhere to the familiar burden-shifting formula set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *Id.* at 672.

Lewis has chosen to attempt to prove discrimination indirectly, using the *McDonnell Douglas* burden-shifting framework.[2] Under this approach, Lewis must first make out a prima facie case of discrimination by showing that (1) she is a member of a protected class; (2) her performance met her employer's legitimate expectations; (3) despite this performance, she was subjected to an adverse employment action; and (4) her employer treated similarly situated

---

[2] Lewis uses the "convincing mosaic" language from *Troupe v. The May Department Stores*, 20 F.3d 734 (7th Cir. 1994) that is ordinarily associated with the direct method of proof, but she uses the language in the course of arguing that St. Margaret's reason for firing her was a pretext, the final part of the *McDonnell Douglas* framework. Even if Lewis had attempted to proceed under the direct method of proof, she would still be unsuccessful, as her main pieces of circumstantial evidence are St. Maragret's illegitimate employment expectations and the pretextual reason for her termination. For the reasons I discuss below, neither is sufficient to support an inference of discrimination.

employees outside of the protected class more favorably. *Barricks v. Eli Lily & Co.*, 481 F.3d 556, 559 (7th Cir. 2007). The burden then shifts to St. Margaret to articulate a non-discriminatory reason for its decision, which Lewis can then attack as a pretext for discrimination. *Id.*

The parties do not dispute that Lewis is a member of a protected class and was subjected to an adverse employment action when she was terminated. St. Margaret argues that Lewis hasn't made a prima facie case of discrimination because she can't show that she was meeting their legitimate expectations. I agree.

Legitimate employment expectations mean simply *bona fide* expectations because "it is no business of a court in a discrimination case to decide whether an employer demands 'too much' out of his workers." *Coco v. Elmwood Care, Inc.*, 128 F.3d 1177, 1179 (7th Cir. 1997). So long as St. Margaret's employment expectations are made in good faith, without fraud or deceit, I only determine if Lewis met them. *Robin v. Espo Eng'g Corp.*, 200 F.3d 1081, 1090 (7th Cir. 2000). If not, Lewis is not entitled to present her case to the jury, and I don't have to go through the other steps of the *McDonnell Douglas* formula. *Id.*

Lewis was not meeting St. Margaret's legitimate employment expectations if she was insubordinate. *Everroad v. Scott Truck Sys's, Inc.*, 604 F.3d 471, 478 (7th Cir. 2010) ("[plaintiff] was not meeting her employer's legitimate expectations if she was insubordinate; insubordination is a non-discriminatory reason for termination..."). There is no question that St. Margaret had a legitimate, *bona fide* interest in preventing insubordination, especially since the employee handbook clearly stated that even one incident of insubordination was sufficient to warrant dismissal. *Contreras v. Suncast Corp.*, 237 F.3d 756, 760 (7th Cir. 2001); [DE 59.]

Lewis argues that St. Margaret's charge of insubordination is false and a pretext for discrimination. Ordinarily, Lewis would have to establish her prima facie case before St. Margaret would be subjected to the pretext inquiry, however, when an employer argues that an employee was fired for not meeting legitimate job expectations, the credibility of the employer's claim is at issue for both the second element of the plaintiff's prima facie case and the pretext inquiry. *Everroad*, 604 F.3d. at 477-78; *Hague v. Thompson Distribution Co.*, 436 F.3d 816, 823 (7th Cir. 2006). In such cases, it is simpler to analyze the legitimate expectations prong and the pretext question at the same time, keeping in mind that if Lewis has not presented sufficient evidence of pretext, she also did not show that she was meeting St. Margaret's legitimate expectations. *Hauge*, 436 F.3d at 823.

Pretext means "a dishonest explanation, a lie rather than an oddity or an error." *Kulumani v. Blue Cross Blue Shield Ass'n,* 224 F.3d 681, 685 (7th Cir. 2000). "Pretext requires more than showing a decision was mistaken, ill considered or foolish, and so long as the employer honestly believes those reasons, pretext has not been shown." *Ballance v. City of Springfield*, 424 F.3d 614, 624 (7th Cir. 2005) *quoting Jordan v. Summers,* 205 F.3d 337, 343 (7th Cir. 2000).

This is not a particularly close call. Lewis doesn't dispute the basic facts. Charge nurse Tina Tuskan twice asked Lewis to clean a bed so that a patient could be admitted. Lewis refused to do it, telling Tuskan to call Gloria Wilcher if she wanted the bed cleaned. [DE 51-1 at 45-46.] Susan Greenwald fired Lewis as soon as Lewis returned from vacation, noting on the Corrective Action form that Lewis' "refusal to do the work assigned is unacceptable and will not be tolerated." [DE 51-1 at 71.]

Lewis argues that the insubordination claim was pretextual because charge nurse Tuskan was not her direct superior and therefore, by definition, refusing Tuskan's request was not insubordination. This bit of sophistry is undermined by Lewis' own testimony. Lewis excuses her April 3 write-up on the grounds that the charge nurse ordered her to clean beds:

> "A:   . . . And when I came back, like I said, Mary Jane, **or whoever was in charge**, would say, 'No, we have two beds.' So I would have to do the bed, so I would call and let them know that I couldn't go to outpatient .
>
> ...
>
> Q:   And who was Mary Jane?
>
> A:   Mary Jane, **she was usually the charge nurse on four east**."

[DE 51-1 at 17.] (emphasis added). This supports St. Margaret's position that the charge nurse was "in charge" (as Lewis puts it), and dispels Lewis' argument that it was perfectly okay for her to refuse the nurse's order and that therefore St. Margaret's is lying. Since she admitted the insubordinate conduct and has not presented any credible evidence of pretext, this case is essentially over.

Perhaps reasonable minds could disagree over whether the management of St. Margaret's overreacted, or whether Lewis' conduct justified termination. But these would be the wrong questions to ask. The issue is whether Lewis was meeting *St. Margaret's* legitimate expectations. And its position is that they needed the room cleaned to get ready for a new patient and they can't put up with a housekeeper refusing such assignments. Whether one agrees with this position or not, it is certainly a legitimate position to take, and Lewis has failed to show that there is anything pretextual about the stance that St. Margaret's has taken.

The "bits and pieces" of other pretext evidence Lewis puts forward are unconvincing. Lewis claims that when she was suspended for three days, in an incident that was unrelated to her termination, the memo Hoyer-Lareau and Greenwald wrote about her workload at the time was inaccurate. Lewis claims that this shows St. Margaret was lying about its performance expectations all along. But if Lewis is going to succeed on this argument, her burden is to show that St. Margaret's stated employment expectations were phony – that her superiors never actually expected her to be able to take on the increased work and were lying when they said they did. *Coco*, 128 F.3d at 1179  ("Firing an employee for failing to meet expectations that the employer never actually had is firing for a phony reason.").

The evidence shows the opposite. Her superiors, forced by circumstances to do more with less, very much wanted Lewis to complete her work and bent over backwards trying to make sure it happened. Mentgen met with Lewis and ordered Lewis' supervisors to respond to her complaints *point by point*. When even that wasn't enough, the supervisors themselves met with Lewis to work out a compromise, allowing her to ask for help when she had too much to do. Despite this, Lewis had a poor track record in the months leading up to her termination. She was written up five times for failing to clean her assigned area, including a three-day suspension. She admits she regularly failed to clean her assigned area and goes so far as to ridicule the very idea that she had a responsibility to keep her supervisors informed on those occasions. I simply see no credible evidence that St. Margaret did not have legitimate job expectations, and I see plenty of evidence that Lewis was not meeting them.

In sum, insubordination is a legitimate, non-discriminatory reason for termination, and Lewis has admitted to the fact that she was insubordinate. *Hague*, 436 F.3d at 824 *citing*

*Ballance*, 424 F.3d at 621 ("By admitting the conduct at issue . . . [Plaintiff] is left attacking [Defendant's] . . . business judgment. This will not suffice. We do not sit as a super-personnel department with authority to review an employer's business decisions as to whether someone should be fired or disciplined.") Even if she were performing flawlessly up until the Tuskan incident (and it doesn't appear that she was), insubordination alone is a sufficient, non-discriminatory reason for her termination. Accordingly, Lewis has not presented sufficient evidence of pretext and has not made a prima facie case of age discrimination.

## CONCLUSION

Therefore, for the foregoing reasons, Defendant St. Margaret Mercy's Motion for Summary Judgment [DE 51] is **GRANTED**. The clerk shall **ENTER FINAL JUDGMENT** in favor of Defendant, stating that Plaintiff Bertha Lewis is entitled to no relief. The clerk shall treat this civil action as **TERMINATED**. All pending dates and motions in this case are **VACATED**.

**SO ORDERED**.

ENTERED: September 30, 2013.

s/ Philip P. Simon<br>
PHILIP P. SIMON, CHIEF JUDGE<br>
UNITED STATES DISTRICT COURT